Good morning. James Carr for the appellant, which is the Placer County Air Pollution Control District. I wish to make it clear to the court that it is not the county of Placer that is involved in this litigation. The District Court, Eastern District of California, denied our motion for summary judgment based on the 11th Amendment, sovereign immunity, which we were claiming for the Placer County Air Pollution Control District, as well as on state sovereign immunity. We filed our appeal of that, and that's why we're here today. The appellant, at least it's our contention, the appellant is an arm of the State of California. It is one of the 35 pollution control enforcement districts that are authorized by the State legislature. The head State agency is the California Air Resources Board, and the legislative scheme in California is such that that's the State agency, and it has 35 enforcement districts. Some of them are continuous with counties, such as Placer County Air Pollution Control District. Let me ask you something. I mean, I've read all of that. Let me ask you, if Mr. Beentjess were to obtain a favorable judgment in this case against the district, let's say for $4 million. Yes, if he were. If he were. I'm just assuming that. Who would pay that judgment? Initially, that judgment would be covered by insurance, which the Special Risk District Management Authority has purchased on behalf of all special districts that are members of that particular organization. Let's assume. Would the district have to pay any of that? Is there, you know, an initial upfront cost by the district? Yeah. They had to pay a deductible, and then there was. How much is the deductible? I believe it was $10,000, Your Honor. And then let's assume that he gets more than $4 million. Let's assume he gets $10 million. Right. There's not enough insurance to cover that. Who would pay that? It's my understanding in our argument. Well, you know this district better than we do, so who would pay it? The district would go bankrupt because it has insufficient funds to pay this. What about the district attorney?  would go bankrupt because their assets would revert to the State of California under the Health and Safety Act. Could the plaintiff take the judgment and attempt to collect from the State? He could file a claim with the Board of Control and try to collect it. Well, that's different. Pardon me? That's different. My question was, could he take the judgment and execute against the State? Anybody can try anything, but the question is, would he have a right to do that? I think he'd have a right to try to do that. Whether he would be successful or not is another issue. The point being that the State has entered into an agreement with the EPA, and they put what's called a State implementation plan into effect called a SIPA. Part of that is that there's a State that requires a State to enforce all clean air regulations throughout the State of California, and they've chosen to do it through the 35 enforcement districts that are some regional, some continuous with counties. There's a further section in the Health and Safety Code that says if this entity goes out of business, and that could be from a judgment it couldn't take, that the State has to pay, or it could be from a judgment it couldn't pay, or it could The county could just decide they don't want to do it. Or they could just decide they don't want to be part of the enforcement scheme. But who did you just say? The county or the district. I meant the district. The district can't say that. The district is required, once that SIPA is signed by the State with the EPA, they have to do what the State Air Resources Control Board tells them. They have to enforce all laws that are statewide. They have to inspect and enforce all laws related to stationary air sources within their geographic area. The Health and Safety Code of California provides that if they should go out of business, that their assets revert to the State. And some other agency But you just got to – wait a minute. Now, as I understand it, you just got to tell me they couldn't go out of business. They can't choose to go out of business. They can't – this district can't say, well, we don't want to do this anymore. I thought that was the import of your question. What I'm saying is if they were forced out of business by a judgment, a monstrous judgment beyond which they don't have any assets to pay, whatever obligations they had would revert to the State of California. The State would then be forced to give their county to another air resources area, regional district, or they would have to come in themselves and do this. Because they cannot refuse to enforce the clean air laws within a particular region in California or a particular county area simply because they don't want to. They would lose funds from the EPA. They would lose transportation funds. The State would suffer greatly if they just let it dissolve and go into nonexistence. Let me ask you this. Is the county of – is it Placer? County of Placer? Yes. Are they required to provide any funding from the county funds to the district? They provide some funds. There are some. Do they do that just gratuitously or are they required by statute or by regulation to change in 1994, and I've cited that in my opening brief, there was a State legislative bill to change the organization of these entities somewhat. And as a result, Placer County had no further ultimate control over this entity. They provided some ex officio employees. Mr. Benjes is one of those. They provided some other county funds to put into this. There are several cities within the county that have provided some funds. The main source of funds comes from the State, through the vehicle taxes and through money that the State has allocated to their different districts to perform the air pollution control function. So that – So my question, though, was does the county – is the county required to fund to any extent the district? I think it's not required to fund this. It's not a county agency. So they gratuitously give money to the district, then? They want to participate because they want clean air in their county, and the State is saying there's an air pollution control district, it's in your area, you are going to be part of it. But the State doesn't make the county fund the entire operation. The State's the one who's putting in the majority of the money. But the – I thought most of the money came from taxes from the county taxpayers. They're not county taxes. Well, they're – no, no, they're not county taxes. They're taxpayers in the county who pay taxes. That's – but isn't that where the money comes from, for the budget? For example, they pay a vehicle licensing fee based on that, and they pay – All right. Let's just get the first – But it's collected by the State, and then it's distributed. Okay. But those are funds that come from the taxpayer, and that's how it's – how the district is funded. The district imposes the tax. It's not entirely funded by taxes. It also – But the majority is funded by taxes. You said the majority was funded by the State. Most of the money comes from the State. The agency is – it has to enforce these regulations. If they find someone who's violating them, they can charge them a penalty or a fee. And so they, in essence, impose a fine on them. They collect some of their money from enforcement of these laws. But the bulk of the money comes from the State of California. And the State would be on the line if a huge judgment was obtained by Mr. Benjies against this entity, because they don't have the money to pay a $5 million or a $10 million judgment, for example. In the State multibillion-dollar budget, is there a line item for the Placer County Air Pollution Control District? I'm sure somewhere within the CARB – that's the California Air Resources Board – that there's an item that says so much goes to this air pollution control district, so much goes to the South Coast Regional Air Pollution Control Management District. They allocate – Is that the allocation of the tax – of the taxes that they have collected? There are tax revenues as well as funds that are collected specific to people that live within Placer County. But I think that this is where Judge Namrall in the Eastern District went astray on this, is he's focusing on the actual monetary how much – what percentage is paid on this judgment. The case law that I've cited to this Honorable Court indicates that it's the potential liability to the State that is the issue in determining whether the State funds and the State treasury are at risk. That's cited in the U.S. Supreme Court, University of California v. John Doe. And that's a 1997 case, U.S. Supreme Court, dealing with the University of California and whether it would be responsible for a judgment. And it's given sovereign immunity, even though it can be sued. It's a separate corporate body. It raises some of its own funds through charging people, at this point, outrageous fees to enroll there. And it is still given sovereign immunity because a different test is used. It's a two-prong test. It's under the Hess v. Port Hudson Supreme Court from 1994, where they look at the relationship of the entity to the State. And if they determine that it is a part of the State, then they consider it an arm of the State, and that ends the analysis, and they give it state sovereign immunity as well as United States' Eleventh Amendment sovereign immunity. That's in the University v. John Roe case. That's in the Port Huron case. That's also in the case that I cited as an additional citation out of Puerto Rico, the Redondo – I can't remember the gentleman's exact name – Redondo Construction Corporation v. the Puerto Rico Highway and Transportation Authority. I cited that case to the Court because it goes through the analysis. It explains this two-pronged analysis. It comes to the conclusion that in Puerto Rico, that particular highway authority was, in essence, a private construction company and not entitled to Eleventh Amendment immunity. But it's the analysis that they use to reach that that's important for the Court, because the district court refused to use that, engage in that analysis. The Court can't control it. Consider whether we were an arm of the State or an instrumentality of the State. It grants you that the relationship between the district and the State is important, but part of that relationship is looking at whether or not the State would ultimately be responsible for payment of this – of a very large judgment. And so far, all you've said is that potentially Mr. Benjies could try to attempt to collect from the State, but there's nothing – even if – let me ask you this. Even if the State were to take over this district, the functions of the district, after a large judgment that the district couldn't afford, does that mean that the State would still have to pay the judgment? If it assumed the assets and liabilities of the district, yes. It just couldn't administer the Clean Air Act for the county? If the State would be forced to either come in on its own, or if they wouldn't do that, the EPA could come in and establish their own agency there. That's the – that's the penalty that the State of California faces is if it doesn't comply with the State implementation. Counsel, if there was a judgment against the district, the primary – the primary debtor would be the district, right? At this point, yes. All right. But you're saying that because the State is a guarantor, we guarantee that if you don't have enough money, we'll pay it. That doesn't make it an arm of the State. A guarantor is not an arm. It's the relationship between the district and the State. Is that right? Am I right or wrong? It would be a factor that the Court could consider, I believe. I don't know if it's absolute, makes it right or wrong. Why would anybody have to come in? Judge Ferguson's county went bankrupt, I think. I'm sorry to hear that. And what they did was reorganize. They did. And then they went back into business. Why wouldn't the district, if it went bankrupt, just reorganize like everybody else and just the creditors get screwed? That's all. It could try to reorganize. I agree. But the statute, and when we're – I believe that what the Court needs to look at here when it looks at the relationship of the district to the State is to look at what the statutory regulatory scheme is in the State of California. And that's established in the Health and Safety Code. And we've cited that to the Court. And under that, if a district goes out of business, the assets revert to the State. Therefore, under that relationship, the State is ultimately responsible. What happens if the county goes out of business? Pardon me? What happens if the county goes out of business? It doesn't affect this district, because this is a county. No, no, not the district. Let's just say the county goes out of business. They say, look, we've had enough of trying to deal with the governor, the legislature, the taxes, it's all too much. We're just going to go out of business. What would happen? Are you saying a county of Placer? Any county. The county of Orange goes out of business and says, you know, we've just had it. We've had it. You know, we're not going to do it anymore. We don't want a county. All the counties in California could go out of business, but the State would still have to enforce the State implementation plan. And wouldn't they have to do – the State have to do something to take over from a county that went out of business? The State could take under this Health and Safety Code statute, which we cited to the Court. If the State said, we're tired of dealing with this, they could say, EPA, you come in and take care of California. We give up. They could say that. They're not going to, but they could. And the points under the University of – the Regents of the University v. John Doe is that it's the potential liability of the State. The specific language in there – I believe I quoted it in my briefs – it indicates the fact that the entity that I represent has insurance doesn't affect its sovereign immunity. It's the relationship between it and the State and the State regulatory scheme. And – Who chooses – who chooses the directors of the district? How are they – how do they come into office? The City – they're like – I think there are three cities. They designate, under the law, a member to sit on the board of directors of the – Each city in the county? Not each city, but three of the larger cities, in this case in Placer County, designate a representative. The county designates a representative. They form a board. It's an independent board. It is not – The State has nothing to do with it. The State law requires that this be done. The State has nothing to do with it. They're formed under State law, just like, you know, corporations are formed under State law. It doesn't appoint these people, no, if that's what you're asking. What's that? The Governor of California doesn't appoint these, but the State legislature and the Health and Safety Code says this is how you organize these special districts. So the State is telling people what to do. The State legislature has acted and has enacted a regulatory scheme. And I believe that one of the things that the Judge Damerill said was we didn't perform central State functions. I think that that was a clear error on his part. If you look at the cases that we've cited, both Ninth Circuit cases, California State court cases, they all show a history of where we got from the get-go to where we are now in the air pollution control business. And it shows that they perform a central governmental function. These air pollution laws are not just specific to the continuous area of Placer County. They are statewide. They are required. That's another reason I cited the Delaware case, Supreme Court case, Superior Implementation of these plans. I cited the California case story, Supreme Court, district courts of appeal. It all showed what the regulatory scheme is. I believe that Judge Damerill didn't focus on the regulatory scheme. He focused on these five Mitchell tests. And if you focus on those, you will never get out of the forest, because there's always another what-if, what-if, but-if. If you look at the university, the Regents of the University v. John Rowe, they simply say, we don't have to do those tests. We can do this other two-prong test. And they do it. And they find that the university is an arm of the State. And that's why I cited the Northern District of California case, Zanina Pablico Estobal v. University of California, San Francisco. Excellent analysis in here by Chief Judge Marilyn Patel. And she indicates that the university is entitled to State, the Eleventh Amendment immunity. She speaks to these five tests under Mitchell. And it is the ---- Scalia. Have you asked the Attorney General of California his opinion as to whether or not this district is an arm of the State? Carvin. I haven't requested that, no. Scalia. You haven't requested that? Carvin. No.  Why not? Carvin. I didn't feel it was necessary. You thought he'd be against you? I'm sorry to say this, but it seemed so apparent to me, unlike Judge Patel, it seemed apparent to me that it was. And I was basically overwhelmed by Judge Garimal saying it isn't. So we're here to say, I think I was right and I think we're right, and we would like you to reverse his judgment and give us our sovereign immunity and have the case dismissed so they can then march down to Placer County in their 30 days and start at us in the county. They still have a remedy. It's not like they're out of court. I think my time is quickly expiring, so I will sit down. It's expiring. Thank you very much, counsel. Thank you. Okay. If I may please the Court, I'm Rod Bushnell, and I represent the Appley, Jacob Appley Convention in this matter. Your Honor, to answer your question, we asked the same question in an interrogatory during discovery in this case. They answered the interrogatory by saying that the district, the air pollution control district, has $2 million in liability insurance coverage, which should be sufficient to satisfy a judgment in this case. They go on to explain what the liability coverage is. It is unknown if the district would have the right to seek reimbursement from the State of California because it would first look to Placer County for replacement of funds. Judge Damerol, in his opinion, held this interrogatory answer against the district and said that they have not said that should there be a judgment greater than the liability insurance coverage, that somehow the State of California would be implicated. There is no evidence in this record, there has never been presented anything, any statute, any memorandum of understanding, anything that says that the State of California would pay a judgment in this case if it was greater than the liability insurance. Judge Damerol, so that did you on your own determine what the basis was for the statement that they would first go to the county for reimbursement? I have no idea why Mr. Carr put that in the interrogatory answer. I don't think it's accurate. It's been somewhat of a moving target, but our information could only be obtained from the defendants and the plaintiff. And as much as we have struggled with it, Judge Damerol struggled with it, and he finally, in his opinion, simply said that this interrogatory answer is an omission on their part and I'm going to hold it against them. And he does that in his opinion. As to the funds coming from the State of California, Judge Damerol goes into that and there's a statute, it's very explicit, it does not come from the State of California. It's 40701.5. The district, in its discretion, in its discretion under this statute, can add to surcharge to the vehicle licenses that to fund the district, that money is collected by the State and immediately returned to the district, and it applies to the geographical boundaries of the district, Placer County. So it's a discretionary tax on vehicle owners in the Placer County Air Pollution Control District. That's all it is. It's Mr. Carr has consistently made the argument that somehow that transforms the funds into State funds, and Judge Damerol very specifically says the mere act  of collecting the funds, 95 percent of the budget comes from the local district. Only 5 percent comes from the State of California. How about the Federal government? Any money from the Feds? I'm sorry? Any money from the Feds? I'm not sure. Any money from the Federal government? Absolutely not. As far as I know, there's a small fund that the State pays, but otherwise, the money all comes from the district. Judge Damerol wrote a 29-page incisive decision in this case. And there's not, unless there's questions, not really anything that I can add to it. He wrote two opinions. First opinion, he came back and rewrote it because he wanted to be very accurate about it. We presented the discovery, the deposition evidence, the interrogatory question, the answers that we had on the Eleventh Amendment issue. We had done discovery on it. Under the Mitchell-Belanger test, which is clearly the test that applies, we have met all five prongs. Judge Damerol found that we had met all five prongs. I think it's a, not even a close case in terms of that there's no Eleventh Amendment immunity here. Thank you. Thank you. Do you wish a minute or two for rebuttal, or are you satisfied? We'll give you a minute. If it's really rebuttal. First of all, Judge Damerol vacated his first opinion. We filed a motion for reconsideration. Under Rule 59 and under Rule 60. For some reason, he seemed to think we weren't timely, but that was a really bad motion. Well, that didn't really matter. He did it all over again. I just want to be clear that I wasn't sure how he was treating our motion and how he was treating the evidence. We also made evidentiary objections to some of these interrogatories. I don't believe Judge Damerol ever ruled on them. Did you object to your own interrogatory answer? There were other ones that he introduced that I objected to, and then he objected to some of ours, and then he tried to turn around and use them in the oral arguments. So I objected to him because he objected to ours, and Judge Damerol just kind of said I'll take it under consideration. And he never made a formal ruling on any of our, to my knowledge, on our objections. You could look at the transcript of the hearing. It's part of the excerpts of the record of the two oral arguments. But we did have a dispute back and forth over the use of some of the things. I don't remember exactly which things it were. But I don't believe that Judge Damerol's opinion is the opinion that this Court should use. This Court is going to review this de novo, and I believe that Judge Damerol didn't use the arm of the State, instrumentality of the State analysis. And had he used that, he would have reached the same opinion, not the same opinion that he did, but he would have reached a different opinion, because he would have reached the same conclusion that, for example, that Judge Patel reached in the oral argument. Sotomayor What's your response to his reference, to counsel's reference to that interrogatory answer that counsel read to us? Verrilli, My response is that we could have looked to the counsel's answer, and I think   to look to the county for money, but the county doesn't have the money to give it to us and they wouldn't have given it to us. This district is run on a shoestring. Ex officio employees of the county, State funds here, fees that are collected here and there, it's not like it's a Cadillac agency funded by the State. And these funds, he was describing that for these vehicle funds that are somehow specific to the people in Placer County, that's true to a certain extent. But our governor simply, by a stroke of a pen, eliminated a huge chunk of the vehicle licensing fee taxes when he took office. So that to say that the county has control over these State funds that are sent back to us as part of a State-imposed tax, I don't buy that argument. I've raised that point here, that the taxes come from the State, and I wish to again say that I believe that the statutory regulatory scheme in this situation should control. That was the intent of the State legislature of California when they enacted the California Air Resources Board and these enforcement agencies. They're exercising police power. That's clear from the cases we've cited. Scalia. All right. We've given you more than a minute or two. We've given you too much. What question? You receive money from the Federal government. Not to my knowledge, unless the Federal government gives the State a grant. You can't answer that. I can't answer it because I can't trace it. There's no direct money coming from the Federal government to the Placer County Air Resources Control Board, and we can't negotiate directly with the Federal government. We have to go through the CARB State Organization. All our regulations that we may enact have to be approved by them. They have budget oversight over us. We turn in budgets to them. They're State-controlled. We're an agency of the State. We're, in essence, a police agency of the State, enforcing the air pollution control regulations. Well, so are police departments. I know.  I know, but we're enforcing not just State law, but State regulations. State administrative regulations dealing with air pollution control, and I believe that we're clearly an agent, arm, or instrumentality of the State of California. Thank you. I have no doubt you believe that. Okay. Thank you, Counsel. Case just argued will be submitted. Thank you both very much. Final case of the morning is Kathleen Conroy versus 3M Corporation. Oh, my goodness. Ah, this machine is heavy.
judges: Ferguson, Reinhardt, Paez